UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SONNIEL GIDARISINGH,

        Plaintiff,

        v.                                  Case No. 04-C-038

GARY McCAUGHTRY, et al.,

        Defendants.

ORDER DENYING THE DEFENDANTS' MOTION TO DISMISS (DOC. # 117)

Plaintiff, Sonniel Gidarisingh, a state prisoner at all times relevant, filed this civil rights complaint under 42 U.S.C. § 1983 alleging various constitutional violations. This order addresses the defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(c).

## I. STANDARD OF REVIEW

A party may move to dismiss on the pleadings under Rule 12(c) after the pleadings are closed. A motion for judgment on the pleadings is subject to the same standards as a Rule 12(b)(6) motion to dismiss. *United States v. Wood*, 925 F.2d 1580, 1581 (7th Cir. 1991). In ruling on a motion for dismissal, the court must presume all of the well-pleaded allegations of the complaint to be true. *Miree v. DeKalb County*, 433 U.S. 25, 27 n.2 (1977). A party fails to state a claim only if it "can prove no set of facts upon which relief may be granted." *Bethlehem Steel Corp. v. Bush*, 918 F.2d 1323, 1326 (7th Cir. 1990) (citation omitted). The court must assume well-pleaded allegations are true and draw all reasonable inferences in the light most favorable to the plaintiff. *Id*.

That more than one legal theory might fit the allegations of a complaint is immaterial, as long as those allegations give notice of a legally sufficient claim under federal law. *Harrell v. Cook*, 169 F.3d 428, 432 (7th Cir. 1999). Facts alleged in a brief in opposition to a motion to dismiss as well as factual assertions contained in other court filings of a *pro se* plaintiff may be considered when evaluating the sufficiency of a complaint as long as they are consistent with the statements in the complaint. *Gutierrez v. Peters*, 111 F.3d 1364, 1367 n.2 (7th Cir. 1997).

## II. COMPLAINT ALLEGATIONS

### A.    Preliminary Matters

At the outset, the defendants contend that the plaintiff was only permitted to proceed on a retaliation claim and that his excessive force charges do not state an independent claim. The plaintiff's third amended complaint is the operative complaint in this action. *See Duda v. Board of Ed. of Franklin Park Public School District No. 84*, 133 F.3d 1054, 1056 (7th Cir. 1998)(if a motion to file an amended complaint is granted, the amended complaint supersedes the prior complaint). While the third amended complaint was not screened under 28 U.S.C. § 1915A, it is virtually identical to the first amended complaint which was screened on November 8, 2006. On that date, the court held that the complaint stated First Amendment retaliation and Eighth Amendment excessive force claims. (*See* Order of Nov. 8, 2006).

Next, the plaintiff seeks to introduce newspaper articles published in the *Milwaukee Journal Sentinel* to demonstrate that his speech touches on a matter of public concern and, therefore, is entitled to First Amendment protection. Ordinarily, in ruling on a motion to dismiss, the court may not consider matters outside the pleadings. *Albany Bank*

*& Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002). Generally, if the court receives and does not exclude such materials, it must convert the motion to one for summary judgment under Fed.R.Civ.P. 56. Fed.R.Civ.P. 12(b). However, the court may take judicial notice of matters of public record in deciding a motion to dismiss without converting it to a motion for summary judgment. *Fed.R.Evid.201(b). Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994)(district court properly considered public court documents in deciding a motion to dismiss). Newspaper and magazine articles are among the wide range of material that may be introduced in conjunction with a motion to dismiss. 5C C. Wright and A. Miller, *Federal Practice and Procedure*, Civil § 1364, at 133-140.

In the present case, the plaintiff seeks to introduce five copies of newspaper articles concerning *Sanville v. McCaughtry*, 266 F.3d 724 (7th Cir. 2001), in which prison officials at Waupun Correctional Institutional were found to have provided constitutionally inadequate mental health care to a suicidal inmate. (*See* Pl.'s Ex. A). These articles address the circumstances of the prisoner's eventual suicide and the accuracy of the reporting of deaths in Wisconsin state prisons. *See id.*

The defendants assert that the articles should be disregarded because they are not sufficient to save any claims that are not constitutional violations. In support of their contention, the defendants rely on *Albany Bank & Trust Co.,* 310 F.3d at 971, in which the Court of Appeals for the Seventh Circuit held that documents that are not referred to in the complaint and that are not relevant to a claim should not be considered on a motion to dismiss. However, *Albany* is distinguishable because it involved a contract dispute in which the *defendant* sought to introduce extrinsic materials referred to in the complaint. *Id*. Moreover, the documents in *Albany* were excluded because they were not attached to the

3

complaint or a motion to exclude, but rather to a motion to disqualify the plaintiff's counsel. *Id.* Thus, the court will consider the plaintiff's exhibits when deciding the motion to dismiss.

**B.     Facts**

The plaintiff was incarcerated at Waupun Correctional Institution (WCI) and Columbia Correctional Institution (CCI) at all times relevant. (Complaint [Compl.] ¶ 2). Defendant Gary R. McCaughtry is the Warden of WCI. (Compl. ¶ 3). Defendant Marc Clements is the WCI Security Director. (Compl. ¶ 4). Defendants Steven Schueler and O'Donovan are employed as Captains at WCI. (Compl. ¶¶ 5, 6). Defendants Roelke and Kempfer are employed as WCI Correctional Officers. (Compl. ¶ 7).

Defendant Philip Kingston is the Warden of CCI. (Compl. ¶ 8). Defendant Tim Douma is the CCI Security Director. (Compl. ¶ 9). Defendant Janel Nickel is a Captain at CCI. (Compl. ¶ 10). Defendant Colleen James is the CCI Education Director. (Compl. ¶ 11). Defendants Toma, Pitzen, Millard and Kopfhamer are employed at CCI as Correctional Officers. (Compl. ¶ 12).

The story behind this case begins on July 29, 1998, when Matthew Sanville, an inmate at WCI, committed suicide. (Compl. ¶ 13). The plaintiff was living in the cell next door at the time of Sanville's death. (Compl. ¶ 14). On March 12, 2002, the plaintiff received a letter from an attorney representing Sanville's family, requesting information about Sanville's last days at WCI. (Compl. ¶ 14).

On April 5, 2002, the plaintiff was released from segregation into the general population. (Compl. ¶ 15). Thereafter, at approximately 12:30 p.m., the plaintiff participated in a deposition regarding Sanville. (Compl. ¶¶ 16, 17). During the deposition, the plaintiff testified against security staff members in WCI's Segregation Unit. *Id*.

4

After the deposition, the plaintiff attempted to return to general population but was stopped and returned to segregation by defendant Schueler and an unknown guard. (Compl. ¶¶ 18, 19). When the plaintiff asked why he was being taken back to segregation, defendant Schueler replied, "You seem to don't know how to mind your own business. I am putting you on temporary lock up (TLU) pending an administrative confinement hearing." (Compl. ¶ 19). During his brief time in general population, the plaintiff did not violate any prison rules that would justify a return to segregation. *Id*.

According to the plaintiff, he was taken to TLU in retaliation for testifying against WCI. *Id*. This retaliation continued in the form of fabricated conduct reports and excessive force, as evidenced by the events described below. (*See* Compl. ¶¶ 20-67).

### Kempfer Conduct Report

During breakfast on May 14, 2002, defendant Kempfer came to the plaintiff's cell to serve him breakfast. (Compl. ¶ 20). When the plaintiff told defendant Kempfer that he did not want anything to drink, Kempfer then walked away, leaving the plaintiff's trap open. *Id*. Subsequently, defendant Kempfer issued a conduct report accusing the plaintiff of reaching out and grabbing his hand through the trap door. *Id*.

That same day, the plaintiff asked defendant Schueler to see and preserve the videotapes of the plaintiff's cell during the alleged altercation with defendant Kempfer. *Id*. Further, on May 20, 2002, the plaintiff wrote to defendant Clement to see and preserve the videotape for the plaintiff's disciplinary hearing. (Compl. ¶ 21). However, defendants Schueler, Clement and O'Donovan conspired to keep the video tape out of the plaintiff's disciplinary hearing. (Compl. ¶ 22). On May 30, 2002, defendant O'Donovan found the plaintiff guilty of the conduct report. (Compl. ¶ 22).

5

### Roelke Conduct Report

On May 26, 2002, defendant Roelke passed by the plaintiff's cell during breakfast. (Compl. ¶ 24). When the plaintiff asked defendant Roelke for his meal, Roelke replied, "I don't feed Snitch." *Id*. Later that day, defendant Roelke denied the plaintiff a shower. *Id*.

On May 28, 2002, the plaintiff received a conduct report from defendant Roelke, charging him with making threats. (Compl. ¶ 25). At no time did the plaintiff threaten defendant Roelke. *Id*. Rather, defendant Roelke fabricated the conduct report to retaliate against the plaintiff. *Id.*

On June 18, 2002, the plaintiff was found guilty of the threat charge. (Compl. ¶ 26). Defendant O'Donovan presided over the plaintiff's disciplinary proceedings and found him guilty, even though there was no evidence to support the finding of guilt and the plaintiff had two witnesses testify that he never made any threatening remarks. *Id*.

### Transfer from WCI

On July 11, 2002, the plaintiff was transferred from WCI to CCI. (Compl. ¶ 28). Upon arriving at CCI, defendant Douma ordered that the plaintiff be taken to the most restrictive area of segregation. (Compl. ¶ 29). Defendant Douma also placed the plaintiff on a "two-man escort" to give the illusion that the plaintiff was a violent inmate. *Id*. The plaintiff asserts that he was sent to segregation and put on two-man escort in retaliation for testifying against WCI staff. *Id*. Further, the plaintiff avers that he was prevented from progressing through the steps of the segregation unit, and thereby regaining privileges, because defendant Douma and defendant Clements are friends. *Id*.

6

### Placement in TLU

On October 1, 2002, the plaintiff was taken to the United States District Court for the Eastern District of Wisconsin in Milwaukee, where he testified against WCI staff in the Sanville case. (Compl. ¶ 30). The correctional officers that escorted the plaintiff from CCI to Milwaukee were in the courtroom and heard his testimony. *Id*. On January 25, 2003, defendant Douma put the plaintiff on administrative confinement even though the plaintiff had not received any conduct reports since his arrival at CCI. (Compl. ¶ 32). The plaintiff contends that he was placed in administrative confinement in retaliation for his testimony against WCI staff. *Id*.

### Tomac Conduct Report

On May 21, 2003, defendant Tomac came to the plaintiff's cell door and tried to open the plaintiff's trap door. (Compl. ¶ 33). When defendant Tomac was unable to open the door, he asked the plaintiff to assist him. *Id*. The plaintiff complied and hit the door with his foot, causing it to open. *Id.* Defendant Tomac then slammed the door shut, told the plaintiff, "You are getting a conduct report," and walked away. *Id*.

The next day, the plaintiff received a conduct report charging him with battery, disrespect and disruptive conduct. (Compl. ¶ 34). The plaintiff avers that defendant Tomac fabricated the conduct report and set him up by ordering him to open the trap. *Id*.

### Pitzen Conduct Report

On June 18, 2003, defendants Pitzen and Millard escorted the plaintiff from the showers to his cell. (Compl. ¶ 35). At that time, the plaintiff's arms were handcuffed behind his back and his legs were restrained with iron leg shackles. *Id*. Upon reaching his cell door,

7

the plaintiff told defendants Pitzen and Millard that the mat he used to kneel on while his shackles were removed had been left in the shower. (Compl. ¶ 36). Defendant Pitzen chained the plaintiff to the cell door and placed his hands on the plaintiff's shoulder while defendant Millard returned to the showers to get the mat. (Compl. ¶¶ 36, 37).

While inmate Millard was gone, the plaintiff heard another inmate call his name. *Id*. When the plaintiff turned his head to see who was calling him, defendant Pitzen slammed the plaintiff into the iron cell door, injuring the plaintiff's collar bone and shoulder. *Id*. Defendant Pitzen yelled, "Keep your head forward," and then he and defendant Millard slammed the plaintiff into the concrete floor. *Id.* Defendant Pitzen told the plaintiff to "Stop resisting," even though he was not resisting. *Id*.

While the plaintiff was laying on the floor, other guards appeared and defendant Pitzen started to punch the plaintiff repeatedly in the head as he yelled, "Stop resisting." (Compl. ¶ 38). At no time did the plaintiff resist, nor was he able to because he was handcuffed behind his back and his legs were in iron leg shackles. *Id*.

While defendant Pitzen punched the plaintiff in the head, defendant Kopfhamer knelt in the plaintiff's back and punched him repeatedly in the right side. (Compl. ¶ 39). Then, defendant Millard joined in and punched the plaintiff while defendant Kopfhamer covered the plaintiff's eyes. *Id*. While the plaintiff's eyes were covered, he felt more punches to his head and right side*. Id.*

Subsequently, the plaintiff was picked up by several guards and unchained from his cell door. (Compl. ¶ 40). Defendant Kopfhamer placed the plaintiff in a head lock and covered his eyes. (Compl. ¶ 41). The plaintiff was then lead to the shower where an unknown guard cut off his clothes. (Compl. ¶ 42). The unknown guard spread the plaintiff's

8

Case 2:04-cv-00038-CNC    Filed 04/13/07    Page 8 of 15    Document 131

buttocks and lifted his testicles in a humiliating way. *Id*. The plaintiff was then taken to a cold cell, where he was held naked and without a mattress or blanket for 26 hours. (Compl. ¶ 44).

As a result of the June 18, 2003, assault, the plaintiff suffered a bruised and swollen collarbone and shoulder, bruised and swollen wrists, a swollen and cut ankle, bruised chest, bruises to his right side and knots in his head. (Compl. ¶ 43). On June 19, 2003, the plaintiff received a conduct report charging him with disobeying orders and disruptive conduct. (Compl. ¶ 45). On July 7, 2003, the plaintiff was found guilty on both counts. (Compl. ¶ 48). The plaintiff was sentenced to 5 days adjustment segregation and 240 days in punitive segregation. (Compl. ¶ 49).

### Retaliatory Events Subsequent to the Complaint

Since the original complaint was filed on January 14, 2004, the plaintiff has been subjected to numerous retaliatory acts. (Comp. ¶ 60). For example, on a number of occasions between January 6 and January 23, 2006, defendant Becker withheld the plaintiff's meals and defendant Hart often withheld the plaintiff's nebulizer and asthma medication. (Compl. ¶ 61).

On May 2, 2006, the plaintiff was transferred back to WCI, where staff refused to treat his asthma, retained his nebulizer for over a week, and threatened to put him in segregation if he continued to request his nebulizer or asked to see the nurse. (Compl. ¶ 63). On May 9, 2006, the plaintiff requested that he be assigned to social worked Fuerstenberg, whom he had been assigned to prior to his transfer to CCI. (Compl. ¶ 64). In response to his request, the plaintiff was issued a major conduct report charging him with soliciting staff. *Id*. The plaintiff was found guilty of solicitation and punished with a 25-day loss of privileges. *Id*.

In June 2006, as an emergency matter, WCI staff transferred inmate Wilson Jackson, who had been assisting the plaintiff with correspondence to the court and to the plaintiff's attorneys. (Compl. ¶ 65). Additionally, the plaintiff has been subject to bullying by defendant Buwalda. (Compl. ¶ 66). Specifically, defendant Buwalda has attempted to have physical contact with the plaintiff and has often blocked the plaintiff's path in an attempt to intimidate or anger him. *Id*. Finally, defendant Randy Mueller dismissed the plaintiff from WCI's music room for loitering, even though he was simply looking at a list of recreational activities. (Compl. ¶ 67).

### III. DISCUSSION

The defendants have moved to dismiss, arguing that the complaint fails to state a First Amendment retaliation claim. Specifically, the defendants contend that the plaintiff's testimony in the Sanville case is not constitutionally protected because it was given in a private lawsuit and, therefore, does not touch on a matter of public concern.

The plaintiff contends that his testimony touches on a matter of public concern because: (1) the Sanville case involved claims of negligent supervision and care on the part of WCI and prison staff members; (2) the Sanville case did not concern an isolated grievance but rather the systematic disregard by prison officials of their duties to provide psychological care and to respond to self-destructive threats and behavior; and (3) the Sanville case drew substantial media attention.

Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." In § 1983 cases, the court may not apply a pleading standard that is more stringent than the notice pleading required by the federal rules. *Sherwin Manor Nursing Center, Inc. v.*

10

*McAuliffe*, 37 F.3d 1216, 1219 (7th Cir. 1994) (citing *Leatherman v. Tarrant County Narcotics Unit*, 507 U.S. 163 (1993)). To state a claim for retaliation, a plaintiff must plead three elements: he must "specif[y] a retaliatory action"; he must name the appropriate defendants; and he must "assert[] a constitutionally protected activity, the exercise of which caused the . . . retaliatory action." *Hoskins v. Lenear*, 395 F.3d 372, 275 (7th Cir. 2005).

There is no dispute that the complaint names the responsible defendants and identifies the retaliatory behavior. Thus, the sole issue to be decided is whether the complaint should be dismissed for failing to assert a constitutionally protected activity.

"An act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *Lekas v. Briley*, 405 F.3d 602, 614 (7th Cir. 2005). Of course, not all actions are constitutionally protected. In the context of an institutional setting, speech is protected only when it relates to matters of public concern. *See, e.g. McElroy v. Lopac*, 403 F.3d 855, 858 (7th Cir. 2005) (inmate's retaliation claim dismissed because his inquiries about prison compensation were purely private in nature and, therefore, did not rise to the level of a public concern); *Sasnett v. Litscher*, 197 F.3d 290, 292 (7th Cir. 1999) (no public concern where Protestant prisoners sought to wear crosses as a religious observance and not for the purpose of making a public statement).

Whether speech addresses a matter of public concern is determined by examining "the content, form, and context of the speech as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 146 (1983). Of the three factors, the content of the speech is the most important. *Gustafson v. Jones*, 290 F.3d 895, 907 (7th Cir. 2002). Speech relates to a matter of public concern if it "can be fairly said to relate to a matter of political, social, or

11

Case 2:04-cv-00038-CNC    Filed 04/13/07    Page 11 of 15    Document 131

other concern to the community, rather than merely a personal grievance of interest only to the employee." *Id*. Thus, the court must ascertain whether the plaintiff's motivation in speaking was to bring wrongdoing to light, to raise other issues of public concern because they are of public concern, or instead, to further some purely private interest. *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999).

First, the plaintiff contends that his testimony touched on a matter of public concern because the Sanville case involved allegations of wrongdoing on behalf of WCI prison officials. In *Connick*, the United States Supreme Court indicated that a matter of public concern could arise where the plaintiff sought to "bring to light actual or potential wrongdoing." 461 U.S. at 148. And, the Seventh Circuit has held that "[w]ithout a doubt, issues of prison security, public safety and official corruption are matters of concern to the community." *Spiegla v. Hull*, 371 F.3d 928, 936 (7th Cir. 2004); *see also Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000)(whether public officials are performing their governmental duties in an ethical and legal manner is a quintessential matter of public concern); *Glass v. Dachel*, 2 F.3d 733, 741 (7th Cir. 1993)("matters of public concern do include speech aimed at uncovering wrongdoing or breaches of public trust.").

The defendants, citing *Brookins v. Kolb*, 990 F.2d 308 (7th Cir. 1993) and *Bridges v. Huibregste*, 2007 U.S. Dist. LEXIS 2477 (E.D. Wis. Jan. 8, 2007), contend that the plaintiff's testimony in the Sanville case was part of a private lawsuit and, therefore, not protected speech. However, the court finds these cases unpersuasive.

In *Brookins,* the prisoner plaintiff, who was a member and co-chair of the Waupun Paralegal Base Committee, wrote a letter to the warden of WCI requesting that all inmates involved in a contested conduct report receive lie detector tests to determine whether

12

the allegations against them were true. 990 F.2d at 310. Subsequently, it was determined that the plaintiff had broken two prison regulations in sending the letter. *Id*. Therefore, the plaintiff was given an early review by the Program Review Committee and transferred to another correctional institution. *Id*. at 311. In affirming the grant of summary judgment in favor of the defendants, the Seventh Circuit held,

> [The plaintiff] did not write the letter to inform the prison officials about a prison issue that was a matter of public interest or concern. The letter only dealt with a matter personal to [the accused]. The letter requested the use of lie detector tests to help disprove the allegations against [the accused]. The letter did not highlight a problem with the way the prison handled its disciplinary proceedings, or urge a change of any prison policy precluding the use of lie detector tests in disciplinary proceedings against inmates.

*Id*. at 313.

In *Bridges*, the inmate alleged that prison officials retaliated against him after he provided an affidavit in a wrongful death suit against the Wisconsin Department of Corrections. 2007 U.S. Dist. LEXIS 2477 at *1. The defendants moved to dismiss, arguing that the plaintiff had failed to state a claim because his speech was not protected by the First Amendment. *Id*. at *3. In granting the motion to dismiss, United States District Court Judge John C. Shabaz stated,

> This case is similar to *Brookins*. Plaintiff provided an affidavit in a wrongful death suit which was personal to [the deceased inmate] and did not address a change in prison policies or procedures which might rise to the level of a public concern. Accordingly, plaintiff's speech and/or conduct . . . was not protected speech.

The present case is distinguishable from *Brookins* and *Bridges* because the plaintiff's testimony in the Sanville lawsuit concerned a systematic disregard by prison officials

13

of their duties to provide psychological care and to respond to self-destructive threats and behavior, as opposed to a merely personal issue. Indeed, this case is analogous *Pearson v. Wellborn*, 471 F.3d 732, 735 (7th Cir. 2006), where the inmate alleged that he received a disciplinary ticket, thereby delaying his release from a maximum security prison, after he complained about various aspects of a restrictive prison unit. Specifically, the plaintiff objected to the practice of denying inmates adequate yard time and shackling prisoners to one another around a small table during group therapy. *Id*. In finding that the plaintiff's speech touched on a matter of public concern, the court noted that his complaints offer "an example of what would be deserving of First Amendment protection: statements to administrators on matters of 'public concern' designed to 'urge a change of any prison policy.'" *Id.* at 740.

Moreover, the plaintiff submits that his testimony in the Sanville case touched on a matter of public concern because the controversy over Sanville's death drew substantial media attention. Although evidence of actual public interest is not dispositive of whether speech relates to a matter of public concern, that the press or other citizens were interested in the circumstances surrounding Matthew Sanville's death is certainly relevant to the issue. *See Gustafson,* 290 F.3d at 907; *see also Miller v. Jones*, 444 F.3d 929, 936 (7th Cir. 2006)(coverage by the *Milwaukee Journal Sentinel* suggested that the plaintiff's testimony was a matter of general interest to the public). As evidenced by the five articles that were written about Sanville's death and the care of mentally ill prisoners, it appears that citizens were interested in the Sanville lawsuit. This lends credence to the conclusion that the content of the plaintiff's speech was a matter of social or cultural concern to the community. Hence,

14

the court is not convinced that the plaintiff can prove no set of facts upon which relief may be granted. *See Bethlehem Steel Corp.*, 918 F.2d at 1326. Consequently,

**IT IS ORDERED** that the defendants' motion to dismiss (Doc. # 117) is **DENIED.**

Dated at Milwaukee, Wisconsin, this 13th day of April, 2007.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE